G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 1394
JORGE L. ALVAREZ, ESQ.
Nevada Bar No. 14466
**ALBRIGHT, STODDARD, WARNICK**
**& ALBRIGHT, P.C.**
Quail Park I, Suite D-4
801 South Rancho Drive
Las Vegas, Nevada 89106
Tel :  (702) 384-7111
Fax :  (702) 384-0605
gma@albrightstoddard.com
jalvarez@albrightstoddard.com

JUAN E. MONTEVERDE, ESQ.
**MONTEVERDE & ASSOCIATES PC**
350 Fifth Avenue, Suite 4405
New York, New York  10118
Tel :  (212) 971-1341
Fax :  (212) 202-7880
Email :  jmonteverde@monteverdelaw.com

Attorneys for the Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| TODD WILLIAMS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TAPIMMUNE INC., PETER L. HOANG, GLYNN WILSON, SHERRY GRISEWOOD, MARK REDDISH, DAVID LASKOW-POOLEY, FREDERICK WASSERMAN, and JOSHUA SILVERMAN, <br><br> Defendants. | CASE NO.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> 1. **VIOLATIONS OF SECTION 14(a) OF THE SECURTIIES EXCHANGE ACT OF 1934 AND RULE 14a-9** <br><br> 2  **VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Todd Williams ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

- 1 -

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiff on behalf of himself and the other ordinary shareholders of TapImmune Inc. ("TapImmune" or the "Company"), except Defendants (defined below) and their affiliates, against TapImmune and the members of TapImmune's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between TapImmune and Marker Therapeutics, Inc. ("Marker").

2.     On May 15, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Marker pursuant to which, Marker shareholders will receive (i) shares of TapImmune's common stock equal to the number of shares of TapImmune common stock issued and outstanding immediately prior to the effective time of the merger, and (ii) a number of warrants equal to the number of TapImmune warrants and stock options issued and outstanding immediately prior to the effective time of the merger (the "Merger Consideration"). Accordingly, immediately following the effective time of the merger, before taking into account the issuance of shares in the private placement transaction described in the Proxy, Marker's stockholders and TapImmune's current stockholders will each own 50% of the issued and outstanding shares of TapImmune common stock on a fully diluted basis (assuming all issued and outstanding warrants and options are exercised). After taking into account the issuance of shares in the private placement transaction described above, immediately following the effective time of the merger, the pro forma ownership of the issued and outstanding shares of TapImmune common stock on a fully diluted basis (assuming all issued and outstanding warrants and options are exercised) will be approximately as follows: Marker's stockholders 27.5%, TapImmune's current stockholders 27.5%, and the private placement transaction stockholders 45%.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

3.     On, July 13, 2018, the Board authorized the filing of a materially incomplete and misleading proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the Proxy, they have failed to disclose material information that is necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's financial projections; and (ii) the valuation analyses performed by the Company's financial advisor, Nomura Securities International, Inc. ("Nomura"), in support of its fairness opinion.

5.     The special meeting of TapImmune shareholders to vote on the Proposed Merger is forthcoming.  It is imperative that the material information omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

6.     For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to TapImmune shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice. *See* Nev. Rev. Stat. § 75.160; *Consipio Holding, BV v. Carlberg*, 282 P.3d 751 (Nev. 2012). Furthermore, "[w]here a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; (ii) TapImmune is incorporated in Nevada and its Registered Agent is located within this District; (iii) Defendants have transacted business in this District including by incorporating TapImmune within Nevada; (iv) Defendants have received substantial compensation by doing business in this District through and with TapImmune, a Nevada corporation; and/or (v) an act or transaction constituting the violation(s) of the Exchange Act alleged herein occurred in this District.

## PARTIES

10.     Plaintiff is, and has been at all relevant times, the owner of TapImmune common stock and held such stock since prior to the wrongs complained of herein.

11.     Defendant TapImmune is a Nevada Corporation with its principal executive offices located at 5 W. Forsyth Street, Suite 200, Jacksonville, FL 32202. TapImmune is a biotechnology company focusing on immunotherapy specializing in the development of innovative peptide and

gene-based immunotherapeutics and vaccines for the treatment of oncology and infectious disease. TapImmune's common stock trades on the NYSE under the symbol "TPIV."

12.     Individual Defendant Peter L. Hoang is the Company's President, Chief Executive Officer and a director.

13.     Individual Defendant Glynn Wilson is a director of TapImmune and is the Chairman of the Board.

14.     Individual Defendant Sherry Grisewood is, and has been at all relevant times, a director of the Company.

15.     Individual Defendant Mark Reddish is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant David Laskow-Pooley is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Frederick Wasserman is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Joshua Silverman is, and has been at all relevant times, a director of the Company.

19.     The defendants identified in paragraphs 12-18 are collectively referred to as the "Defendants".

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of TapImmune common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

21.     This action is properly maintainable as a class action for the following reasons:

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

(a)     The Class is so numerous that joinder of all members is impracticable.  As of July 13, 2018, TapImmune had 10,684,516 shares outstanding held by hundreds to thousands of individuals and entities. The actual number of public shareholders of TapImmune will be ascertained through discovery;

(b)     The holders of these shares are believed to be geographically dispersed through the United States;

(c)     There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

      i.     Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

      ii.     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

      iii.     Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Merger as presently anticipated.

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

## SUBSTANTIVE ALLEGATIONS

### I.   BACKGROUND AND THE PROPOSED MERGER

22.    TapImmune, incorporated on October 22, 1991, is an immuno-oncology company. The Company specializes in the development of peptide and gene-based immunotherapeutics and vaccines for the treatment of cancer. The Company is engaged in developing vaccines that target candidate breast cancers, colorectal cancers, ovarian cancers, and non-small cell lung cancers. The Company combines a set of licensed technologies, including peptide antigen technologies and deoxyribonucleic acid (DNA) expression technologies that improve the ability of the cellular immune system to recognize and destroy diseased cells.

23.    Marker is a clinical stage immuno-oncology company focused on developing adoptive non-gene modified T cell therapies for the treatment of hematologic malignancies such as acute myeloid leukemia, or AML, lymphoma, and multiple myeloma, as well as certain solid tumors. Marker's MultiTAA technology selectively expands non-engineered tumor-specific T cells that are able to kill tumor cells by targeting multiple tumor-associated antigens simultaneously to prevent immune escape and generate durable immunity. Patient/donor T cells are not genetically modified, and therefore, the cost of generating Marker's therapies is significantly reduced. Marker is preparing for Phase II clinical trials. Marker is privately held with offices in New Brighton, Minnesota.

24.    On November 12, 2017, TapImmune announced positive results for the Third Quarter of 2017, with CEO Peter Hoang stating:

> "TapImmune continued to advance its clinical and preclinical programs in the third quarter, which I believe positions us very well to achieve a number of important milestones in 2017 and beyond. I believe TapImmune is well positioned to advance immuno-oncology with its broadly effective cancer vaccine candidates and proprietary technologies in the indications and treatment settings we are targeting. Having joined the company in late September, I was drawn to TapImmune because I see an opportunity to lead our industry, in translating the promise of cancer immunotherapy into potentially life-changing therapeutic outcomes."

25. On April 5, 2018, TapImmune again announced positive results for Q4 and Fiscal Year 2017, with CEO Peter Hoang stating:

> "Throughout 2017, we made significant advances toward achieving our goals and reaching our milestones. We recently announced the publication of new clinical data for our multi-epitope T-cell vaccine targeting folate receptor alpha, TPIV200, in patients with ovarian and breast cancer. In this publication we showed an encouraging potential progression-free survival benefit in women with ovarian cancer in their first remission, which we are currently exploring further in an ongoing randomized Phase 2 study. Should we see a similar, prolonged PFS in this larger study, we believe that TPIV200 could have a viable pathway toward potential approval in this indication, for which it has FDA Fast Track designation. We remain on track to conduct an interim safety and futility analysis for the Phase 2 study by mid-2019."

26. On May 15, 2018, TapImmune issued a press release announcing the Merger Agreement. The press release stated in relevant part:

**TapImmune and Marker Therapeutics Announce Entry into Merger Agreement, Creating a Transformational Immuno-Oncology Platform**

*Transaction Adds Multi-Antigen Targeted Cell Therapy Platform to TapImmune's Peptide Vaccine Portfolio*

*TapImmune Raises $5.1 million in Financing from Current Stockholders*

*TapImmune will Finalize a Strategic Alliance with Baylor College of Medicine*

*Conference Call and Live Audio Webcast Scheduled Today at 8:00 a.m. ET*

**JACKSONVILLE, Florida – May 15, 2018 –** TapImmune Inc. (NASDAQ: TPIV) ("TapImmune") today announced that it has entered into a definitive merger agreement to acquire Marker Therapeutics, Inc. ("Marker"), a privately-held clinical-stage developer of a transformative, non-genetically engineered, multi-antigen T cell therapy platform. The proposed transaction will be a merger-of-equals under which the stockholders of TapImmune and Marker will each own approximately 50% of the combined company, prior to any issuances of additional shares in a contemplated financing. The proposed merger remains subject to certain conditions, including that financing and the approval of TapImmune stockholders. TapImmune and Marker will host a conference call and webcast today at 8:00 a.m. ET.

Peter Hoang, President and CEO of TapImmune, stated, "I believe that the new therapies we are acquiring with Marker in this transaction represent the next major leap forward in cell therapy for cancer. The merger adds to our product pipeline a synergistic portfolio of highly-differentiated T cell therapies that has demonstrated potentially groundbreaking results in early clinical trials in lymphoma, acute myeloid leukemia (AML), and multiple myeloma."

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

"With this merger, I believe we have the opportunity to significantly disrupt the CAR-T and TCR field," added Mr. Hoang. "Compared to current gene-modified T cell therapies such as CAR-T and TCR, the therapies we are acquiring in this transaction are:

·      Highly efficacious and extremely durable, without the need for lymphodepletion before infusion: In our Phase I lymphoma study, we saw complete responses (CRs) in 50-60% of our evaluable patients, a rate comparable to the best reported CAR-T studies in lymphoma. However, unlike in CAR-T studies, we have yet to see a single disease relapse in any responder, whereas typically 30% or more of patients with CR in today's CAR-T studies relapse within one year. In fact, more than half of our CRs are in durable remission beyond a year, with several patients being relapse-free beyond 2-3 years.

·      Non gene-modified: Unlike current CAR-T and TCR approaches, our cell therapeutic approach requires no genetic modification of T cells, which will allow us to manufacture the product at a fraction of the cost, with substantially reduced complexity of manufacturing.

·      Significantly less toxic than CAR-T: With more than 60 patients treated, our therapies have never caused cytokine release syndrome (CRS) or a related serious adverse event (SAE) in patients treated with our therapy. In fact, we have seen only one grade III adverse reaction that was considered possibly related in our patients to date, versus a 95% incidence rate of grade III or higher adverse events in recent CAR-T studies.

·      Multi-antigen specific: Our new technology identifies and selects for substantially all T cells that are specific to any peptide epitope of the antigens we target, including very rare clones that are otherwise undetectable in our deep gene sequencing of patients' peripheral blood. Compared to current CAR-T and TCR approaches, which target a single epitope of only one target antigen, our multi-specific T cell therapy products that are currently in clinical trials have been shown to consist of approximately 4,000 unique T cell clonotypes targeting up to five different tumor-associated antigens.

·      Capable of driving an endogenous immune response: We see consistent evidence of "epitope spreading" in our patients, meaning that our therapy is inducing the patient's native T cells (that are specific to tumor associated antigens that are not targeted by our infused product) to expand and contribute to a lasting anti-tumor effect. This phenomenon, also known as "antigen spreading," has been the stated goal of many CAR-T and TCR developers, but we believe that our therapy is the first to show a consistent ability to drive this effect.

·      Capable of addressing patients currently inaccessible to CAR-T therapies: Because our product is derived from natural patient T cells without gene modification, we are able to treat patients earlier and in indications that are currently not addressable by CAR-T therapies. We have seen strong patients responses that are highly durable, while seeing no associated graft versus host disease (GvHD) in post-transplant relapsed/refractory AML, a setting where currently the only available alternative therapy is a donor lymphocyte infusion (DLI). DLIs generally have very low patient response rates with high rates of severe associated GvHD. CAR-T approaches cannot currently be used in post-transplant relapsed/refractory AML because most envisioned CAR-T therapies are

targeted to antigens expressed on hematopoietic stem cells, potentially causing fatal neutropenia. Furthermore, our therapies can be used as maintenance therapies and in earlier treatment settings than can CAR-T or TCR approaches, which would generate significant toxicities in those settings."

"Executing this strategic merger with Marker Therapeutics will be fundamentally transformational for TapImmune, enriching our strong immuno-oncology pipeline with a revolutionary multi-antigen targeted cell therapy platform. We believe this technology will be a game-changer for the cell therapy industry, potentially overcoming the well-known limitations of today's CAR-T and TCR approaches," concluded Mr. Hoang. "Combined with the four ongoing Phase 2 clinical trials in the TapImmune platform, I believe we are creating a best-in-class cancer immunotherapy platform. With Marker's peptide-based cell therapy platform, we believe that there is an excellent fit with TapImmune's extensive experience and expertise in the research, development, manufacturing and manipulation of peptide-based immunotherapies. Furthermore, the integration of the two companies provides us with a compelling opportunity to create a unique and highly differentiated company in the immuno-oncology field."

John Wilson, CEO of Marker, said, "I feel very fortunate to have been entrusted with one of the premier programs of Baylor College of Medicine's Center for Cell and Gene Therapy, and to integrate it with TapImmune to provide this exceptional technology with a strong commercial pathway. We have great respect for the work that the TapImmune team has done within the immuno-oncology field and believe integrating our respective peptide-based technologies will drive significant advances in the field. By combining TapImmune's experience and expertise in multi-epitope peptide-based approaches to T cell activation with Marker's multi-targeted T cell therapy, while simultaneously leveraging the know-how and facilities of Baylor College of Medicine's Center for Cell and Gene Therapy, we intend to chart a groundbreaking course toward more effective, less complex, non-toxic and cost-effective cancer treatments. Our respective development teams are eager to join forces and drive a unique product pipeline to patients in need. We believe the merger will accelerate clinical development, particularly for the cell therapy platform, which has generated encouraging patient responses in our clinical trials to date. I look forward to taking a position on the post-merger Board of Directors where I can leverage my T cell manufacturing expertise and help the Company implement a highly practical and economical manufacturing platform. By avoiding the need for genetic engineering, the manufacturing process can be greatly simplified, providing us with a great opportunity to successfully address the cost issues that currently plague the field."

In conjunction with the transaction, TapImmune intends to finalize a strategic alliance with Baylor College of Medicine which will include sponsored research, manufacturing support, and advancing early stage clinical trials at the institution.

Merger Related Financing

TapImmune is currently in discussions with a syndicate of leading healthcare-focused institutional investors with respect to a potential financing in conjunction with the merger that will be expected to fund the combined company into 2020.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Private Placement of Common Stock, Warrant Exercises and Financing Commitment

In support of TapImmune's initiatives, including the merger, the Company has entered into agreements with certain institutional stockholder and warrant holders that are expected to provide the Company with approximately $5.1 million in equity financing. The Company's largest stockholder, Eastern Capital Limited, has entered into a Common Stock Purchase Agreement with the Company pursuant to which it will purchase 1.3 million shares of common stock at a price per share of $2.40 providing gross proceeds to the Company of approximately $3.1 million. Other selected institutional holders of outstanding warrants have entered into warrant amendment agreements with the Company to exercise their warrants at an exercise price of $2.50 per share. Upon closing of the warrant amendment agreements, such participating institutional holders will exercise approximately 783,000 warrants providing aggregate proceeds to the Company of approximately $2.0 million.

In addition, Mr. John Wilson, CEO of Marker, has provided a written commitment for additional financing to the Company of up to $1.0 million.

About the Proposed Merger

Existing Marker stockholders will receive newly issued shares and warrants of TapImmune common stock in connection with the proposed merger equal to the number of shares and warrants of TapImmune outstanding at the closing of the merger. TapImmune currently has 10.7 million shares of common stock and approximately 7.0 million warrants and options outstanding (excluding any shares issuable in connection with the financing referenced above). The number of warrants issuable to Marker are subject to increase based upon certain conditions related to the terms of any additional financing closed concurrently with the merger. On a pro forma basis for the combined company, current TapImmune stockholders and current Marker stockholders are each expected to own approximately 50% of the combined company, prior to the contemplated issuance of shares in the financing that is expected to occur concurrently with the merger.

The transaction has been unanimously approved by the board of directors of both companies. The proposed merger is expected to close in the second half of 2018, subject to completion of the concurrent financing and the approval of the stockholders of each company as well as other customary conditions. The merger agreement contains further details with respect to the proposed merger.

Nomura Securities International, Inc. acted as the exclusive financial advisor to TapImmune. Seyfarth Shaw LLP served as legal counsel to TapImmune. Winthrop & Weinstine, PA served as legal counsel to Marker.

Management and Organization

Following the closing of the proposed merger, TapImmune CEO Peter Hoang will be President and CEO of the combined company. Marker CEO John Wilson will join the combined company's Board of Directors as will Juan Vera, M.D., a Co-

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Founder of Marker. The board of directors of the combined company is expected to consist of eight members, three of whom will be designated by TapImmune, three of whom will be designated by Marker, and two of whom will be designated by the investor syndicate. In addition, Marker Co-Founder Ann Leen, Ph.D. will be appointed to the new position of Chief Scientific Officer. Michael Loiacono will continue to serve as Chief Financial Officer and Richard Kenney, M.D. will continue as Acting Chief Medical Officer. Additionally, TapImmune is expected to announce the formation of a new Scientific Advisory Board which will become effective on the closing date of the merger.

Additional Information about the Proposed Merger

In connection with the proposed merger, TapImmune intends to file relevant materials with the Securities and Exchange Commission, or the SEC, including a proxy statement. Investors and security holders of TapImmune are urged to read these materials when they become available because they will contain important information about TapImmune, Marker and the proposed merger. The proxy statement and other relevant materials (when they become available), and any other documents filed by TapImmune with the SEC, may be obtained free of charge at the SEC web site at www.sec.gov. In addition, investors and security holders may obtain free copies of the documents filed with the SEC by TapImmune by directing a written request to: TapImmune Inc., 5 West Forsyth Street, Suite 200, Jacksonville, FL 32202, Attn: Investor Relations. Investors and security holders are urged to read the proxy statement and the other relevant materials when they become available before making any voting decision with respect to the proposed merger.

This communication shall not constitute an offer to sell or the solicitation of an offer to sell or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offering of securities in connection with the proposed merger shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

Participants in the Solicitation

TapImmune and its directors and executive officers may be deemed to be participants in the solicitation of proxies from the stockholders of TapImmune in connection with the proposed transaction. Information regarding the special interests of these directors and executive officers in the proposed merger will be included in the proxy statement referred to above. Additional information regarding the directors and executive officers of TapImmune is also included in its Annual Report on Form 10-K for the year ended December 31, 2017, filed with the Securities and Exchange Commission (the "SEC") on March 23, 2018. This document is available free of charge at the SEC's web site (www.sec.gov) and from Investor Relations at TapImmune at the address described above.

27.     Despite the excessive Merger Consideration, the Board has agreed to the Proposed Merger. It is therefore imperative that TapImmune's shareholders are provided with the material information that has been omitted from the Proxy, so that they can meaningfully assess whether the Proposed Merger is in their bests interests prior to the forthcoming shareholder vote.

## II.     THE PROXY IS MATERIALLY INCOMPLETE AND MISLEADING

28.     On July 13, 2018, TapImmune filed the Proxy with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to cast an informed vote regarding Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### i.     *The Omitted and Misleading Projections*

29.     In a merger transaction complete and accurate financial information is necessary in order for a shareholder to fairly be able to vote.  Perhaps nothing is more relevant to a vote on whether to approve a merger than the earnings picture of the companies involved in the merger. However, Defendants omit from the Proxy: (1) all relevant iterations of projections; (2) the projected probabilities of success ("POS"); (3) TapImmune's and Marker's unlevered free cash flows; and (4) the value of the expected synergy benefits or any pro forma projections.

30.     The *Certain Financial Projections* section of the Proxy is materially incomplete and misleading. On pages 72-73, under the heading May 2018 Projections, it states that TapImmune's management prepared a series of "updated projections" (the "Updated Projections"), indicating the existence of a previous set of projections (the "Initial Projections") that were then updated. As a result of the failure to include the Initial Projections in the Proxy, the Updated Projections provide a materially incomplete and misleading overall valuation picture of

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

TapImmune.  This is especially true given the proximity in time of the update to the Board's final approval of the Merger Consideration on May 14, 2018.  *See* Proxy at 72 ("Following are a series of financial projections on TapImmune's and Marker's potential sales and earnings before interest and taxes which were provided to TapImmune's board of directors on May 14, 2018...").  In other words, the Updated Projections *were not* the projections actually used to evaluate the value of the Company and its strategic options during the actual strategic review process, prior to the time the Board needed to obtain a fairness opinion—the Initial Projections were.

31.     Furthermore, the Proxy notes that the TapImmune Projections included on page 72 are "on a *non*-POS adjusted basis," but also indicates that a POS-adjusted case of projections exists as well.  *See* Proxy at 72 ("The projections reviewed by TapImmune's board of directors *were adjusted by TapImmune to reflect probability of success assumptions* based on TapImmune management's analysis of a number of factors, including management's experience and judgment as informed by historical precedents and, in some cases, industry guidelines.").  The POS-adjusted TapImmune Projections are material to the Company's shareholders, and the failure to include them in the Proxy causes the disclosed *non*-POS adjusted Updated Projections to provide a materially incomplete and misleading overall valuation picture of TapImmune.

32.     The Proxy also fails to provide unlevered free cash flow projections[1] for both TapImmune and Marker. These unlevered free cash flows were utilized by Nomura in their valuation calculations, including the discounted cash flow analyses performed for each company, and are material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free

---

[1]     Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear—is the Merger Consideration fair compensation given the expected unlevered free cash flows?  Without unlevered free cash flow projections, the Company's shareholders are not able to answer this question and assess the fairness of the Merger Consideration.

33.     Moreover, both the TapImmune Projections and the Marker Projections included in the Proxy disclose EBIT without including projections for unlevered free cash flows. EBIT or EBITDA are not sufficient alternatives to unlevered free cash flows—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."  Relying solely on EBIT to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBIT does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[2]  As a result of these material differences between EBIT and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.  Simply put, the unlevered free cash flow projections are material and merely supplying EBIT renders the projections included in the Proxy misleading.

34.     Finally, due to synergies, the value of a merger is often greater than the sum of its parts. The Proxy makes numerous references to synergies and synergistic benefits of the Proposed Merger, but the value of these synergies or any pro forma projections are omitted entirely from the Proxy. Pro forma financial projections portray the value of the two companies together, including any synergies. They represent management's insight and provide the clearest picture of the value

---

[2]     Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

of the combined company. Thus, they speak directly to the question set before shareholders. They allow shareholders to accurately assess whether a smaller stake in the combined company is more or less valuable than a full stake in the standalone company. Accordingly, by referencing the benefits of synergies but failing to disclose their value or include any pro forma projections in the Proxy, Defendants materially mislead TapImmune shareholders.

35.     The omission of the above-referenced projections renders the financial projections included in the Proxy materially incomplete and misleading.   If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.   The question here is not the duty to speak, but liability for not having spoken enough.   With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

        ii.     *The Materially Incomplete and Misleading Valuation Analyses*

36.     Financial advisors like Nomura serve a critical function by providing fairness opinions regarding the valuation of an enterprise. Their valuation analyses are heavily relied on by shareholders, and are expected to represent a complete and accurate state of the two companies' finances. The Proxy omits crucial information concerning Nomura's *Discounted Cash Flow Analyses*, *Comparable Companies Analysis*, and *Comparable Transactions Analysis*, rendering Nomura's "fairness opinion" and the provided summaries of each analysis therein materially incomplete and misleading.

37.     With respect to Nomura's *Discounted Cash Flow* Analyses, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 13% to 15% used for Marker; (ii) the inputs and assumptions underlying the calculation of the discount rate range of 14% to 16% used for TapImmune; (iii) the inputs and assumptions underlying the calculation of the perpetuity growth rate range of -0.1% to 1.0%; and (iv) the actual terminal values calculated.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

38.     These key inputs are material to TapImmune shareholders, and their omission renders the summary of Nomura's *Discounted Cash Flow* Analyses incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).   Such choices include "the appropriate discount rate, and the terminal value…" *Id*.   As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

39.     With respect to Nomura's *Comparable Companies* and *Comparable Transactions* Analyses, the Proxy fails to disclose the individual multiples Nomura calculated for each company and transaction utilized. The omission of these multiples renders the summary of these analyses and the implied equity value reference ranges materially misleading.   A fair summary of companies and transactions analyses requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

40.  In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. As a result of these materially misleading statements and omissions, Plaintiff and the other members of the Class are unable to make an informed decision regarding whether to vote in favor of the Proposed Merger, and are deceived into thinking that the Merger Consideration is fairer to TapImmune shareholders than it really is.  Plaintiff and the Class will therefore been damaged, as their TapImmune shares are undervalued in the Proposed Merger and they are set to retain an unreasonably low ownership percentage of the post-merger Combined Company.

## COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

41.  Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42.  Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

43.  Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

44.  The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

45.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.   Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) the Company's financial projections; and (ii) the valuation analyses performed by Nomura in support of their fairness opinions.

46.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.   Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore negligent,.

47.     Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for TapImmune and the details surrounding discussions with other interested parties and Nomura.   Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.   Indeed, the Individual Defendants were required to review Nomura's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

48.     Defendants were negligent in preparing and reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.   Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully.   Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of TapImmune's financial projections.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

49.     TapImmune is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

50.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and will deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed Merger.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of TapImmune within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of TapImmune, and participation in and/or awareness of the TapImmune's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of TapImmune, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

53.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of TapImmune, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Merger.  The Proxy at issue contains the

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    unanimous recommendation of the Board to approve the Proposed Merger.  The Individual

2    Defendants were thus directly involved in the making of the Proxy.

3    55.    In addition, as the Proxy sets forth at length, and as described herein, the Individual

4    Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The

5    Proxy purports to describe the various issues and information that the Individual Defendants

6    reviewed and considered.  The Individual Defendants participated in drafting and/or gave their

7    input on the content of those descriptions.

8    56.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

9    of the Exchange Act.

10    57.    As set forth above, the Individual Defendants had the ability to exercise control

11    over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by

12    their acts and omissions as alleged herein.  By virtue of their positions as controlling persons,

13    these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and

14    proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably

15    harmed.

16    58.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise

17    of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate

18    and irreparable injury that Defendants' actions threaten to inflict.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and against

the Defendants jointly and severally, as follows:

1.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff

as Class Representative and his counsel as Class Counsel;

2.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees

and all persons acting under, in concert with, or for them, from proceeding with, consummating,

or closing the Proposed Merger, unless and until Defendants disclose the material information

identified above which has been omitted from the Proxy;

3.    Rescinding, to the extent already implemented, the Merger Agreement or any of the terms

thereof, or granting Plaintiff and the Class rescissory damages;

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

4.   Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

5.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

6.   Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 13, 2018

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**

Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

Respectfully submitted,

**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

*/s/ G. Mark Albright*
G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106

*Attorneys for Plaintiff*

DocuSign Envelope ID: CA9E5557-D364-4595-8430-A037513EDDAD

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, _Todd Williams_ ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft of the complaint and has authorized the filing of a complaint substantially similar to the one reviewed.

2.  Plaintiff selects Monteverde & Associates PC and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff sets forth in the attached chart all the transactions in the security that is the subject of the complaint during the class period specified in the complaint.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this August day of _8_____, 2018.

DocuSigned by:

_Todd Williams_

—8D5D01A9E0A84FB...

Signature

DocuSign Envelope ID: CA9E5557-D364-4595-8430-A037513EDDAD

| Company Name/Ticker | Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|---|
| TPIV | Purchase | 6/20/2018 | 3500 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |